IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,     )
          )
          Plaintiff,     )
          )
v.          )   Case No. CR-03-242-D
          )   (Case No. CIV-07-782-D)
OLIVER KEITH BROWNER,     )
          )
          Defendant.     )

**O R D E R**

The matter before the Court is Defendant Oliver Keith Browner's *pro se* Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence [Doc. No. 316]. Defendant raises a claim that his guilty plea was rendered involuntary due to ineffective assistance of counsel. Following a response by the government and Defendant's reply, the Court determined that an evidentiary hearing was necessary and appointed counsel for Defendant. *See* Order Granting Evidentiary Hearing [Doc. No. 322]. Defendant subsequently sought and was granted permission to represent himself. *See* Order 10/8/08 [Doc. No. 343]. However, standby counsel was appointed, and Defendant appeared at the hearing with attorney Bill Zuhdi as standby counsel, who had previously represented Defendant on direct appeal and for resentencing. The evidentiary hearing was held on October 10, 2008.

At the hearing, the Court heard testimony of Defendant and Joseph Wells, the attorney who represented Defendant at trial and in connection with the guilty plea. The Court admitted two exhibits provided by Mr. Wells from his files. Exhibit 1 consists of a cover page and various papers signed by United States Magistrate Judge Robert E. Bacharach; it was admitted without objection. Exhibit 2 consists of a typewritten list of requests and responses (discussed below), a letter regarding

Defendant's proposed cooperation, an FBI report of Defendant's interview by agents, and a record of Defendant's prior criminal case; it was admitted over Defendant's objection.  The Court also took judicial notice of certain documents in the case record, namely, Defendant's Plea Agreement, Petition to Enter Guilty Plea, and Waiver of Jury Trial [Doc. Nos. 148, 149, 150], and certain hearing transcripts:  March 11, 2004, Hearing Regarding Dismissal of Defense Counsel; March 15, 2004, Change of Plea; and December 1, 2004, Sentencing, which also addressed Defendant's *pro se* request to withdraw his guilty plea.  The Court also agreed to consider the record related to Defendant's first direct appeal (No. 05-6005), the court of appeals' Order and Judgment issued January 9, 2007 (*United States v. Browner*, 211 F. App'x 781 (10th Cir. Jan. 9, 2007)), and pertinent portions of the record referred to during the hearing, including pretrial motions filed by Mr. Wells on Defendant's behalf.  Of particular interest was the Motion to Suppress Title III Wiretap Material [Doc. No. 70] and the Order of February 6, 2004, denying that motion [Doc. No. 101].

After careful consideration of the parties' submissions, the existing record, and the additional evidence presented, the Court denies relief for the reasons that follow.

## A.    Factual Background

On October 23, 2003, a criminal complaint was filed against Defendant and three others by FBI Special Agent Andrew Farabow, alleging their involvement since April, 2002, in a conspiracy to possess with intent to distribute and to distribute cocaine base (crack) in violation 21 U.S.C. § 846.[1]  Defendant was arrested the same day and, at his initial appearance, requested appointment

---

[1] *The complaint was accompanied by a summary of an investigation conducted through a joint effort of numerous state and federal law enforcement agencies.  The investigation included confidential informants who made controlled drug buys (some of which were recorded), physical surveillance, and the interception of telephone communications pursuant to an order signed by Judge Stephen Friot of this Court on September 26, 2003.  See Compl. [Doc. No. 1], Farabow Aff., ¶ 12.*

of counsel.  On October 28, 2003, Defendant appeared with his appointed attorney, Paul Antonio

Lacy of the Federal Public Defender's Office, and waived preliminary and detention hearings.

According to evidence received at the § 2255 hearing, Defendant immediately expressed an

interest in cooperating with the government in the investigation.  By letter dated October 28, 2003,

the assigned prosecutor, Assistant United States Attorney Jay Farber, stated the terms under which

Defendant could proffer information.  *See* Ex. 2.  On October 29, 2003, Defendant and his counsel,

Mr. Lacy, signed the letter agreement and appeared for an interview of Defendant by Agent Farabow

and another FBI agent, Charles DeLaughter.  According to the report of that interview, Defendant

gave a detailed account of his drug trafficking activities with Tommy Gene Perry ("Perry")

beginning in California in 2001 and continuing in Oklahoma in 2002 and 2003.  Defendant named

numerous individuals in both California and Oklahoma who were involved in buying or selling

cocaine powder in California, transporting it to Oklahoma, "cooking" it into cocaine base, and

selling cocaine base in Altus, Frederick, and Lawton, Oklahoma.  Defendant subsequently ceased

his cooperation.[2]

On November 19, 2003, the grand jury returned a 34-count indictment.  Defendant was

charged in Count 1 with the conspiracy to possess with intent to distribute and to distribute 50 grams

or more of cocaine base (crack) and 500 grams or more of cocaine; in Counts 2-4, 6, 9, 11, 22, 26

and 29 with distribution of cocaine base (crack) in violation of 21 U.S.C. § 841(a)(1); in Counts 5,

8, 10, 14-18, 20, 21, 23, 25, 27 and 28 with use of a telephone to facilitate the distribution of cocaine

base (crack) or cocaine in violation of 21 U.S.C. § 843(b); in Counts 7 and 24 with maintaining a

---

[2] *Defendant stated at the March 11 hearing regarding his dissatisfaction with Mr. Wells that he "backed out of the Rule 11 when [he] asked Charlie DeLaughter" a particular question and received an answer that caused Defendant to believe Agent DeLaughter was "involved with Tommy Gene."  See Hr'g 3/11/04 Tr. 53-54.*

place for the purpose of distributing and using controlled substances in violation of 21 U.S.C. § 856(a)(1); in Count 12 with interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952(a)(3); in Count 19 with possession of cocaine in violation of 21 U.S.C. § 841(a)(1); in Counts 30 and 31 with possession with intent to distribute cocaine base (crack) in violation of 21 U.S.C. § 841(a)(1); in Count 32 with possession of firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1); in Count 33 with possession of a firearm with the serial number obliterated or removed in violation of 18 U.S.C. § 922(k); and in Count 34 with being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1).

Defendant was arraigned on November 24, 2003, and the case was set for jury trial in January, 2004. In December, 2003, Defendant through counsel sought additional time to file pretrial motions and a notice of defenses due, in part, to the volume of discovery produced by the government, including numerous audio recordings, photographs, and documents. *See* Unopposed Appl. Enlargement Time [Doc. No. 57]. Although the extension was granted, no motions were filed, and Mr. Lacy instead moved to withdraw as counsel due to a conflict of interest that had developed because another client of the Federal Public Defender's Office wished to cooperate with the government in the prosecution of Defendant. The motion to withdraw was granted on January 5, 2004, and a motion by the government to continue the trial was granted the same day. Mr. Wells entered his appearance as substitute counsel for Defendant on January 14, 2004.

Mr. Wells promptly moved to file pretrial motions out of time. He then filed the Motion to Suppress Title III Wiretap Material, a motion for disclosure of Rule 404(b) evidence, a motion to reveal information regarding informants, and two motions to dismiss, one of which questioned the constitutionality of 21 U.S.C. § 841(b) under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The motion to suppress challenged the court-ordered wiretap of two telephone numbers subscribed and

billed to co-defendant Gwendolyn Holmes and allegedly used by Defendant, based on the alleged insufficiency of the application and supporting affidavit.  In response, the government submitted a copy of Agent Farabow's affidavit and argued why a wiretap was necessary to the investigation under the circumstances.  *See* Gov't's Resp. Def.'s Mot. Suppress, Ex. A [Doc. No. 90-1].  The motion to suppress and all other pretrial motions were denied on February 6, 2004.  Mr. Wells filed a motion in limine, or Motion to Prohibit Paid Witnesses to Testify for the Prosecution as Being in Violation of the Fifth and Sixth Amendments, on March 1, 2004; this motion was denied on March 5, 2004.  By that date, all other defendants in the case had entered pleas of guilty under plea agreements, and upon motion of the government, Counts 32, 33 and 34 against Defendant had been dismissed.  *See* Order of Dismissal 3/3/04 [Doc. No. 136].

On March 5, 2004, Defendant appeared in court for a *James*[3] hearing, and Agent Farabow testified concerning the factual basis for admitting co-conspirators' out-of-court statements as evidence against Defendant.  The jury was selected and empaneled on March 8, 2004, and the presentation of evidence was scheduled to begin on March 15, 2004.  On March 10, 2004, the Court received a letter from Defendant dated March 8, 2004, requesting dismissal of Mr. Wells and appointment of substitute counsel due to Mr. Wells' alleged refusal to subpoena evidence and witnesses that would be helpful to the defense and Defendant's lack of confidence in Mr. Wells' representation.  The letter was filed as a *pro se* motion [Doc. No. 144] and was set for hearing on March 11, 2004.

Defendant appeared at the hearing and was examined by the assigned trial judge, Judge Ralph Thompson, concerning the nature of his dissatisfaction with Mr. Wells.  In addition to a

---

[3] *United States v. James*, 590 F.2d 575, 580 (5th Cir. 1979).

speedy trial concern, which is no longer an issue, Defendant stated his desire to subpoena telephone

records, Mr. Perry, evidence that Perry was forewarned by Agent DeLaughter about a search warrant

for his house, evidence regarding whether the government lawfully obtained and executed court

orders for pen registers and wiretaps, and evidence to show that the FBI, particularly Agent

DeLaughter, was shielding Perry and his nephew, Cotis Perry, from prosecution for numerous

offenses (including Cotis Perry's alleged murder of an individual).   Concerning the wiretap,

Defendant expressed concern that the application, order, and first recorded telephone call occurred

the same day, and he demanded proof that SBC and Sprint received the order before wiretapping

began.   Defendant also expressed his belief, based on the content of particular recordings, that illegal

listening devices and scanners were used.   Defendant summed up the gravity of his concerns as

follows:

> It's a lot of illegal stuff going on in this case that I have proof of and I explained to
> my – my lawyer. . . .   He brushed me off.   And here we are right now picking a jury
> and getting ready for trial.   I don't have one person subpoenaed, not one document
> subpoenaed, not zip.   I have nothing.   Just me.

Hr'g 3/11/04 Tr. 56.

In response, Mr. Wells explained that he filed a motion to suppress the wiretap evidence, and

"if the Court had granted me a hearing on that, I intended to go into everything that applied to that

wiretap.   The Court overruled my application, so the Court has ruled on that, and so it's time to

move on . . . ."   *See* Hr'g 3/11/04 Tr. 63.   As to the other concerns, Mr. Wells offered to provide a

further explanation or to submit for court review a document he had prepared, but he expressed

hesitation in revealing matters of trial strategy.   Mr. Wells described the proffered document as

follows:   "I have prepared a list of the subpoenas that Mr. Browner has mentioned that he wanted

me to file.   I have a response to each one as to what I believe and what the circumstances are."   *See*

Hr'g 3/11/04 Tr. 65.  Judge Thompson declined to delve into matters of trial strategy, observing: "Disagreement on trial strategy is – is categorically, something that often occurs.  It's not necessarily the – the most important criterion on a request to substitute counsel . . . .  So I don't  – I don't believe that we need to run the risk of jeopardizing Mr. Browner's interests in any way by revealing . . . what the trial strategy and tactics will be in the course of his defense."  *See* Hr'g 3/11/04 Tr. 65-66.  Turning to proper considerations in ruling on a motion for substitute counsel, Judge Thompson determined that the circumstances shown by the record did not justify a substitution of counsel.  *See* Order 3/12/04 [Doc. No. 146].

On March 15, 2004, the parties proceeded with opening statements in Defendant's jury trial. The government's presentation of evidence began with the testimony of Agent Farabow and the admission of exhibits.  During the lunch recess, as discussed below, the parties reached a plea agreement and Defendant elected to waive a jury trial and plead guilty to Count 1.  Judge Thompson reconvened court that afternoon for a change of plea hearing.   During the hearing, Defendant confirmed his desire to plead guilty, his understanding of the plea petition, and the correctness of his answers in the petition.  He expressed, in his words, "clear agreement" to the waiver of his jury trial rights.  *See* Hr'g 3/15/04 Tr. 4.  He also affirmed the voluntariness of his decision and the absence of any force or coercion.  *See* Hr'g 3/15/04 Tr. 6.  Defendant, under oath, fully admitted the factual basis for his plea of guilty to the drug trafficking conspiracy charged in the Indictment, the extent of his involvement, and other facts bearing on his possible sentence.

Following the disclosure of the presentence report and a court-ordered mental competency evaluation of Defendant, Judge Thompson convened a sentencing hearing.  One of the first issues taken up at the hearing was the substance of letters that Defendant had written since his guilty plea in which he denied his guilt and stated he had not committed any crime nor incriminated himself in

any crime and that he planned to withdraw his guilty plea. Judge Thomspon construed Defendant's statements as a request to withdraw his plea and gave Defendant an opportunity to be heard on that request. During the hearing, the underlying reasons for the request were discussed. These included ineffective assistance of counsel, Mr. Wells' failure to subpoena evidence (primarily telephone records) and witnesses, denial of substitute counsel, and a coerced plea in that Defendant allegedly was forced to plead guilty to avoid a mandatory life sentence. In addressing the judge at the hearing, Defendant reiterated many of the same complaints he had made in the March 11 hearing regarding substitution of counsel. After carefully considering the relevant factors, including substantial prejudice to the government if a trial was required at that point and a finding that the guilty plea was knowing and voluntary at the time it was entered, Judge Thompson denied Defendant's motion to withdraw his plea and proceeded with the sentencing.

During the sentencing hearing, a significant issue regarding the recommended sentence under the Sentencing Guidelines was Defendant's acceptance of responsibility. Mr. Wells explained to Judge Thompson the extent of Defendant's cooperation with the investigation after he entered his guilty plea, including two meetings between Defendant, Mr. Wells, and agents in which audiotapes and videotapes were reviewed and Defendant provided information to the government. It was after this cooperation that Defendant began writing letters denying his involvement in the drug conspiracy. Mr. Wells argued that Defendant should receive a sentencing adjustment for his initial acceptance of responsibility and the help he provided. The prosecutor confirmed Defendant's initial cooperation with agents but argued that Defendant's subsequent letter-writing campaign "was the antithesis of the acceptance of responsibility." *See* Hr'g 12/1/04 Tr. 112. Judge Thompson agreed with the prosecutor and denied the adjustment, as well as a motion filed by Mr. Wells seeking a downward departure. Then, in light of uncertainty in the law at that time regarding the

constitutionality of the Sentencing Guidelines, Judge Thompson imposed alternative prison sentences of life imprisonment or, in the event the Sentencing Guidelines were found to be unconstitutional, a term of 35 years.

After sentencing, Mr. Wells was permitted to withdraw, and a new attorney (Mr. Zuhdi) was appointed to represent Defendant for purposes of appeal.  On appeal, Defendant raised the same issues addressed at the sentencing hearing, namely, claims of ineffective assistance of counsel and an involuntary plea, and the issue of whether the trial court abused its discretion in denying Defendant's motion to withdraw his guilty plea.  Defendant also sought resentencing in light of *United States v. Booker*, 543 U.S. 220 (2005).  The government initially filed a motion to enforce the appeal waiver provision of the plea agreement but subsequently withdrew its motion with respect to the sentence imposed due to post-*Booker* appellate decisions addressing a defendant's right to appeal *Booker* error.

On January 9, 2007, the court of appeals determined that Defendant's claim of ineffective assistance of counsel in the negotiation of a plea agreement was not barred by his waiver of appeal under a narrow miscarriage-of-justice exception recognized in *United States v. Hahn*, 359 F.3d 1315 (10th Cir. 2004) (en banc), and *Untied States v. Elliott*, 264 F.3d 1171 (10th Cir. 2001), and explained in *United States v. Cockerham*, 237 F.3d 1179, 1184 (10th Cir. 2001).  In so holding, the appellate court accepted Defendant's allegations "that his counsel was unwilling to subpoena telephone records and a witness that would have provided defenses to the charges against him and proven his innocence," that "he would not have pleaded guilty had his lawyer obtained the exculpatory evidence Browner asserts was available," and that "he had no choice but to accept the plea, since 'three-fourths of his case was based on the [disputed] telephone calls.'" *Browner*, 211 F. App'x at 784.  In keeping with its usual practice, however, the court declined to reach the merits

of Defendant's ineffective assistance claim and reserved it for a collateral § 2255 proceeding.  As to the sentencing court's *Booker* error, the case was remanded for resentencing.

Defendant was resentenced on March 1, 2007, and received the alternative prison sentence of 35 years (420 months).  Defendant again appealed, and in the second appeal, the court of appeals granted the government's motion to enforce the appeal waiver and dismissed the appeal.  *See United States v. Browner*, 225 F. App'x 761 (10th Cir. May 30, 2007).  Defendant filed his *pro se* § 2255 Motion on July 16, 2007, raising a single ground for relief.  Defendant claims he was deprived of his Sixth Amendment right to counsel in connection with the negotiation of his guilty plea based on the allegation that Mr. Wells' failure to subpoena witnesses and telephone records left Defendant with no option but to plead guilty.  *See* Motion at 5.[4]

**B.    Hearing Evidence**

Defendant testified in narrative form during the hearing concerning the now-familiar litany of acts and omissions by Mr. Wells that allegedly left Defendant with no trial defense and forced him to plead guilty.   The focus of Defendant's desired defense remains telephone records, documents, and witnesses regarding Perry, his alleged relationship with law enforcement agents, and the court-authorized wiretap and pen registers.  Defendant testified that he presented Mr. Wells with a long list of documents and witnesses to be subpoenaed and reasons why they were needed but Mr.

---

[4] *A memorandum attached to his Motion includes an additional argument that counsel provided inadequate advice concerning the possible sentence, that is, that Defendant "was still vulnerable under [18] U.S.C. § 851 to be sentenced to a mandatory life sentence."  See Motion, attach. 1 [Doc. No. 316-2] at 14.  This argument is factually incorrect, as the government agreed to and did dismiss the § 851 enhancement as part of the negotiated plea.  See Order of Dismissal 12/1/04 [Doc. No. 250].  Further, Defendant has not pursued any allegation of deficient plea advice in subsequent filings or the evidentiary hearing. Therefore, the Court disregards this argument as unfounded and abandoned by Defendant.*

Wells refused to pursue any of the requested evidence.  Defendant testified that they argued during jury selection about the issue, and Mr. Wells refused to use any of Defendant's evidence.

According to his testimony, Defendant requested subpoenas of the following persons and evidence:  Perry and his telephone and bank records and passport;[5] Agent DeLaughter and his telephone records and passport; Magistrate Judge Robert Bacharach, to testify concerning search warrants he signed on which the signatures appeared to Defendant to be fraudulent; Bob Carter, who allegedly was head of the drug task force in Altus that worked on this case, to testify concerning his alleged protection of Perry and his nephew, Cotis Perry; Judge Stephen Friot to testify concerning the wiretap order; SBC and Sprint, to produce records concerning the wiretap and telephone calls that were made or recorded after the order was issued; Cotis Perry, to testify concerning a murder he allegedly committed for which he was questioned but released, to show the complicity of law enforcement agents; three DEA agents who executed his arrest warrant; evidence (a firearm and ammunition) seized from Perry's house on October 23, 2003, when a warrant was executed; Cicilia Wright, Perry's niece, to testify concerning a conversation between Perry and Agent DeLaughter and the alleged fact that Perry brought contraband and weapons to her house when he was warned about a search warrant for his house; a Tillman County district attorney who made a published statement about the case; Billy Haynes, a Tillman County public defender who allegedly had a relationship with Perry; all four of Defendant's co-defendants in the case; an FBI agent who allegedly took Defendant out of jail and drove him around to identify drug houses; all members of the District 3 and District 5 drug task forces involved in this case; Christopher Ware, an assistant attorney general who wrote a letter regarding the wiretap; drug agents who allegedly searched

---

[5] *Defendant believes passports may show that Perry and Agent DeLaughter took a trip to Jamaica together.*

Defendant's house in Frederick before they obtained a search warrant; the Altus homicide detective who released Cotis Perry from jail; Perry's girlfriend; and others whose identities were unclear from Defendant's testimony.

During his hearing testimony, Defendant's focus concerning the court-authorized wiretap and telephone recordings was that he never saw the order or any SBC and Sprint records showing they received authorization to begin recording telephone calls on September 26, 2003. Repeating and explaining statements he had previously made in the March 11 hearing regarding substitute counsel, Defendant testified that the wiretap authorized the interception of calls on two telephones, one at Ms. Holmes' house and a cellular phone serviced by Sprint that did not work in Frederick, Oklahoma. Defendant testified that it was undisputed he stayed in his house in Frederick during the week of October 5-12, 2003, so his calls could not lawfully have been recorded that week. Defendant testified further concerning his belief that the telephones at his house were "bugged" rather than wiretapped and that calls were recorded before any wiretap order was issued.

Concerning his guilty plea, Defendant testified that his guilty plea was involuntary because he was forced to go to trial with representation by Mr. Wells, who had refused to investigate and prepare a defense. According to Defendant, the coercion arose from his conclusion that he would not get a fair trial, a conclusion he reached on the first day the government began presenting its case to the jury. In Defendant's view, Mr. Wells' cross-examination of the government's first witness, Agent Farabow, was ineffective and Mr. Wells had no defense plan or strategy. Defendant testified that he went back to his cell and thought, "I'm going to get life." It was this perceived certainty of receiving a life sentence of imprisonment that Defendant considers amounted to coercion. Defendant also testified that he tried to withdraw his guilty plea soon after it was entered but Mr. Wells refused to help him and wrote a letter in May, 2004, that, according to Defendant, said

basically, "Do it yourself."  Finally, Defendant testified that Mr. Wells did not discuss with him the motion for a mental competency evaluation.

The government called Mr. Wells to testify concerning his representation of Defendant. Mr. Wells has been a licensed attorney since 1974 and has 20 years of experience on the CJA panel. Mr. Wells testified that he assumed Defendant's representation from Mr. Lacy and received hundreds, maybe thousands, of pages of discovery, including documents regarding the wiretap as reflected in the Motion to Suppress Title III Wiretap Material.  Mr. Wells testified that, consistent with his practice, he discussed Defendant's options with him at their first meeting.  Mr. Wells recalled that before he assumed the representation, Defendant had already gone to the United States attorney's office for a "Rule 11 meeting" that generated a thorough FBI 302 report, and the terms of that meeting were stated in Mr. Farber's October 28 letter, which basically provided that, if Defendant "backed up," everything he said could be used against him.

Mr. Wells confirmed that Defendant gave him a list of evidence and items that he wanted Mr. Wells to obtain.  One issue Defendant raised was differences between Judge Bacharach's signatures on the search warrants and the order of detention; Defendant was suspicious based on apparent discrepancies that Judge Bacharach had not actually signed the warrants.   Mr. Wells testified that he declined to subpoena Judge Bacharach but promised, "I'll check that out."  Exhibit 1 reflects a packet of orders that Mr. Wells took to a meeting and discussed with Judge Bacharach on March 1, 2004.  Judge Bacharach confirmed that all the orders reflected his signature.  No mention was made of any other issue regarding the searches.

Exhibit 2 reflects a typewritten list of subpoenas Defendant requested, which was prepared by Mr. Wells' secretary from a handwritten list Defendant provided.  Mr. Wells worked from the typewritten list and added his notes regarding each item as to why Defendant wanted it.  Mr. Wells

was anticipating the need for court approval to issue subpoenas and the need to justify them in an *ex parte* application.  Mr. Wells testified that the focus of Defendant's concern was why Perry had not been arrested or charged.  Mr. Wells recalled that most of the things on the list involved Perry and had nothing to do with Defendant's case and the substantive charges against Defendant.  Upon examination concerning the list, Mr. Wells explained that a notation of "NO RESPONSE NECESSARY" regarding an item – like the first one, "Charlie DeLaughter's Phone Record" – indicates that Mr. Wells considered the item to fall within the category of material that had nothing to do with the charges against Defendant.  Mr. Wells testified that, in his view, it was not in Defendant's interest to inject Perry into the trial because Defendant had already said in his Rule 11 interview that Perry sold him drugs.  Mr. Wells testified that, when they discussed calling Perry as a witness, Defendant said Perry would testify that Defendant was innocent and, when reminded of his prior statements at the Rule 11 interview, Defendant said he would "take it all back."

As to evidence regarding the wiretap, Mr. Wells testified that he explained to Defendant that Judge Thompson had already denied the motion to suppress and this matter was not relevant to the trial; the wiretap was by then an appellate issue.  According to Mr. Wells, he went over each item on the list with Defendant and explained why it was not helpful or relevant.  In his view, the defense was "boxed in" by what Defendant had already said to FBI agents.  Concerning a person listed as "Pete" on the list, Mr. Wells testified that this was a confidential informant who was cooperating with the government; Mr. Wells already had an FBI 302 report regarding his statements and he was expected to testify and be cross-examined.  Similarly, as to all cooperating witnesses, any prior statements, plea petitions, or change of plea transcripts would be available to the defense.  Mr. Wells testified that he concluded nothing on the list would be helpful in preparing a defense to the Indictment.

Mr. Wells also testified that he was fully prepared to proceed with the jury trial on March 11. No plea offer was available to Defendant at that time because he was unwilling to cooperate with the government and was "consumed with collateral issues." Mr. Wells denied making any threat or coercive statements to Defendant concerning his plea and explained his position to be that he had an ethical obligation to inform any client truthfully concerning the likely outcome of a trial and the possible sentence. Mr. Wells corroborated Defendant's testimony that the first day of trial evidence proceeded with the case agent's direct examination and cross-examination and then a lunch recess. According to Mr. Wells, however, Defendant initiated the idea of further plea discussions during the lunch recess by saying something to the effect of: "It looks bad. Do you think they'd let me plead?" Mr. Wells then approached the government to inquire about a possible change of plea. The government's attorneys provided plea papers, and Mr. Wells took them and filled them out with Defendant.

Mr. Wells testified concerning plea negotiations as follows: from the time Mr. Wells began representing Defendant until the time of trial, Defendant never suggested that he wanted to plea bargain.[6] After the trial started, it was too late to get a favorable deal. The plea agreement offered by the government was harsh, but it was the best that was available. At that time, Defendant seemed satisfied with it and satisfied with Mr. Wells. Mr. Wells recalled that Defendant even told him "good job." Mr. Wells testified that the best hope for a lesser sentence was to seek a downward departure at sentencing if the government used Defendant as a cooperating witness against others. Mr. Wells testified that, in subsequent meetings with agents, Defendant told the agents everything they wanted to know and identified people in audio and video recordings. However, when

---

[6] *Mr. Wells observed that any plea deal needed to happen back at the time of Defendant's Rule 11 proffer, before Mr. Wells represented Defendant.*

15

Defendant learned that Perry had not been arrested, he stopped cooperating and would not do anything else; according to Mr. Wells, Defendant "changed his tune."

Concerning Defendant's request to withdraw his guilty plea, Mr. Wells testified as follows: Defendant told him after he (Defendant) quit cooperating that he wanted to withdraw his plea. Mr. Wells was surprised by Defendant's change of mind because, in Mr. Wells' view, the guilty plea had been Defendant's idea mid-trial and was completely voluntary. Mr. Wells advised Defendant that he had no legal ground to request to withdraw his plea and no legal basis for such a motion. Mr. Wells filed the motion for a mental competency evaluation after he went to discuss the presentence investigation report with Defendant and Defendant refused to discuss the report, and instead stood and "screamed" at Mr. Wells. Based on this meeting, Mr. Wells decided to explore whether there were mental health issues that might be used in mitigation at sentencing. Mr. Wells expressed his belief that he did the best he could for Defendant and he wished Defendant had continued his cooperation so that he could have obtained greater benefit from his plea agreement.

On cross-examination, Mr. Wells admitted that he was not concerned with Perry's part in drug trafficking or a connection between Perry and Agent DeLaughter because, if proven, it would be irrelevant to the charges against Defendant. Mr. Wells also confirmed that he wrote a letter to Defendant in February, 2004, to put in writing what they had discussed and his decision not to subpoena things that he considered not to be relevant. Mr. Wells testified that he refused to do some of the investigation Defendant wanted, did some things he wanted, and engaged in other preparation of which Defendant was unaware. Regarding telephone records, Mr. Wells explained that he already had all the records and recordings that the government was going to use at trial. He testified that he and Defendant went through the records together and Defendant indicated the ones he had questions

about.  According to Mr. Wells, the government's evidence against Defendant was overwhelming

and included audiotapes and videotapes of Defendant engaging in hand-to-hand drug transactions.

**C.**     **Ineffective Assistance of Counsel Claim**

　　　　　1.     Standard of Decision

　　　　　Ineffective assistance of counsel claims are . . . guided by the now familiar
*Strickland* test.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d
674 (1984).  Under this test, a petitioner must show that "his trial counsel committed
serious errors in light of 'prevailing professional norms' and that there is a
'reasonable probability' that the outcome would have been different had those errors
not occurred."  *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir.1993) (*quoting
Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

*United States v. Mora*, 293 F.3d 1213, 1217 (10th Cir. 2002).  In the context of a guilty plea, the

prejudice prong of the *Strickland* test requires a showing "that there is a reasonable probability that,

but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on

going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Romero v. Tansy*, 46 F.3d 1024,

1033 (10th Cir. 1995).  As the person claiming ineffective assistance of trial counsel, Defendant

bears the burden to prove his claim by a preponderance of the evidence.  *See Young v. Sirmons*, 486

F.3d 655, 674-75 (10th Cir. 2007); *Sallahdin v. Mullin*, 380 F.3d 1242, 1248 (10th Cir. 2004).  If

Defendant's proof fails either prong of the *Strickland* test, the Court need not reach the other, and

the two prongs may be addressed in any order.  *Fields v. Gibson*, 277 F.3d 1203, 1216 (10th Cir.

2002); *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000).

　　　　　The Supreme Court explained in *Strickland* the "highly deferential" degree of scrutiny to be

applied to an attorney's strategic decisions:

　　　　　A fair assessment of attorney performance requires that every effort be made to
eliminate the distorting effects of hindsight, to reconstruct the circumstances of
counsel's challenged conduct, and to evaluate the conduct from counsel's
perspective at the time.  Because of the difficulties inherent in making the evaluation,
a court must indulge a strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689.  Regarding challenges to an attorney's decisions concerning the scope or nature of an investigation, the Court in *Strickland* further stated:

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91.

Where a defendant pleads guilty but claims that ineffective assistance rendered the plea involuntary, the Supreme Court has explained the proper application of the prejudice prong of *Strickland* as follows:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial.  For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.  This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Hill*, 474 U.S. at 59.  When a defendant claims after pleading guilty that he felt he had no other choice due to counsel's ineffectiveness, the defendant's statements and testimony at his plea hearing and any findings by the trial judge as to the voluntariness of the plea may properly be considered.  *See Romero*, 46 F.3d at 1033.

2.      Reasonableness of Counsel's Failure to Investigate

From the record and the evidence presented in this case, the Court finds Defendant has not

shown that Mr. Wells failed to make a reasonable investigation of the charges in the Indictment and

possible defenses thereto.  The evidence and record are clear that Mr. Wells was knowledgeable

about the discovery materials, the government's likely evidence, the legal issues, and the factual

issues to be tried to the jury.  In fact, despite allegations that Mr. Wells was unprepared for trial,

Defendant's real complaint – and the focus of his § 2255 Motion and evidentiary presentation – are

that Mr. Wells failed to subpoena particular items of evidence that Defendant requested.  These

items can be grouped into three general categories:  telephone records related to the charges against

Defendant; telephone records and other evidence to show complicity between Perry and Agent

DeLaughter or other agents; and Tommy Gene Perry and witnesses who could have established

Defendant's innocence.

a.      Telephone Records

Two types of telephone records are at issue.  One type is records related to the court-

authorized Title III wiretap and records related to other telephones allegedly used by Defendant

during the course of the conspiracy.  The second types is records that might show a relationship

between Perry and Agent DeLaughter.  The second type merits little discussion.  The fact that Perry

was engaged in drug trafficking or other illegal conduct but was receiving protection from FBI

agents, assuming it is true, would not provide any defense to the charges against Defendant.  There

is no apparent connection between Perry's conduct and the government's case against Defendant

under the Indictment.  Mr. Wells acted reasonably in refusing to investigate this issue.

Regarding records that might show illegal wiretapping or recording of communications, such

records would provide a trial defense to the extent that the government intended to use an illegally

19

obtained audio recording as evidence against Defendant at trial.  Mr. Wells correctly observed that he challenged the Title III wiretap by a timely filed pretrial motion to suppress evidence.  The Court finds that Mr. Wells made a reasonable judgment not to pursue further investigation concerning the wiretap generally, as opposed to particular recorded conversations.

Regarding particular conversations, Defendant has identified one particular telephone that he believes was illegally recorded, that is, a telephone line at his house in Frederick where he stayed during the week of October 5-12, 2003.  It is unclear what could be proved from telephone records concerning this line.  Further, the only charge in the Indictment based on a telephone communication during that week was Count 25, which charged Defendant and Ms. Holmes with using a telephone on October 9, 2003, to facilitate a distribution of crack.  Ms. Holmes' home telephone was at that time subject to the court-authorized wiretap and, according to the criminal complaint, the telephone call utilized that line.  *See* Compl. [Doc. No. 1] at 19.

Defendant has not articulated how any additional telephone records, beyond what were already available to the defense, would have been helpful to his defense.  He has not presented any evidence to refute Mr. Wells' testimony, brought out on cross-examination by Defendant, that Mr. Wells had copies of all the telephone records and audio recordings that the government intended to use at trial.  Mr. Wells testified that he had reviewed those materials with Defendant and he had identified particular calls that might be subject to challenge.  From the evidence presented, the Court finds no unreasonable conduct by Mr. Wells in failing to conduct a further investigation into telephone records relevant to the charges in the Indictment.

b.    Evidence Concerning a Relationship Between Perry and Agents

The primary focus of Defendant's claim – and a primary source of dissatisfaction throughout the representation – is Mr. Wells' lack of interest in the government's failure to arrest or charge

Perry with any criminal offense.  The apparent unfairness of the government's aggressively prosecuting all possible charges against Defendant but bringing none against Perry – the person who allegedly brought Defendant to Oklahoma to engage in his drug business – is clear.  As stated above, however, Perry's culpability for similar criminal offenses provides no defense to the charges against Defendant.  The Court finds that it was not unreasonable for Mr. Wells to view Perry's conduct as a collateral issue.  Defendant has presented no allegation or evidence to suggest that Perry was directly involved in the criminal conduct charged in the Indictment or that any  relationship between Perry and law enforcement officers caused unfounded charges to be brought against Defendant.  In short, the Court finds that Mr. Wells made a reasonable professional judgment not to investigate the alleged relationship between Perry and Agent DeLaughter or other agents.

c.    <u>Perry and Other Requested Witnesses</u>

Somewhat inconsistently with his other arguments, Defendant alleges that Mr. Wells should have subpoenaed Perry and other witnesses to testify in his defense.  Although not reflected by the list in Exhibit 2, Defendant's request to subpoena Perry as a witness was discussed in the March 11 hearing, and Mr. Wells admitted in his testimony that he and Defendant discussed whether to call Perry as a witness.  The list in Exhibit 2 reflects that Defendant requested subpoenas of only a few other witnesses who may have had knowledge of the activities charged in the Indictment, including an informant (Pete), his girlfriend and step-son, and perhaps Cotis Perry.  Of the other potential witnesses listed during Defendant's testimony, the only ones whom he allegedly wanted to testify in his defense (as opposed to testifying about Perry) were his co-defendants.[7]

_____

[7]  *One exception is Defendant's mention in his testimony of law enforcement agents who executed his arrest warrant and drug task force members who worked on his case.  It is unclear how this testimony would have helped his defense.  Defendant also mentioned an allegation of a warrantless search of his house.  This allegation remains unexplained, and thus, the Court finds it to be unsubstantiated.*

The evidence shows that Defendant had already implicated Perry and his nephew, Cotis, in statements he gave FBI agents and statements made in court proceedings.  Aside from Mr. Wells' ethical obligation not to present false testimony, calling them as defense witnesses to testify concerning Defendant's alleged innocence may have permitted the prosecutor to introduce Defendant's prior statements concerning drug dealings between them.  More importantly, given Defendant's efforts to implicate Perry and Cotis in uncharged criminal conduct, there was no assurance their testimony would have been favorable to Defendant.  Concerning Pete, Mr. Wells' testimony is undisputed that Pete would have been a government witness and no subpoena of him was necessary.  It is unclear what Pete's girlfriend and her step-son could have offered that was exculpatory; from Exhibit 2, it appears Defendant was interested in their knowledge that Pete was selling drugs for the FBI.  Such testimony would not have been helpful to Defendant, who allegedly was involved in transactions with Pete.  Similarly, all co-defendants entered into plea agreements with the government, and Defendant presents no evidence to suggest they would have provided testimony helpful to his defense.  In short, the Court finds on the record presented that Defendant has not established any unreasonable conduct by Mr. Wells in failing to subpoena witnesses requested by Defendant to testify for the defense at trial.

For the above reasons, the Court finds Defendant has failed to prove that Mr. Wells committed any error of professional judgment in refusing to issue the subpoenas that Defendant requested.  Mr. Wells' noncompliance with Defendant's requests was not objectively unreasonable.  Further, considering Mr. Wells' performance in light of prevailing professional norms, the Court finds no serious error that would justify a finding of ineffective assistance of counsel.  Therefore, Defendant's ineffective assistance claim fails the first prong of the *Strickland* test and lacks merit.

3.    <u>Voluntariness of Defendant's Guilty Plea</u>

On the additional question of whether Defendant was prejudiced by any error that occurred, the Court finds that Defendant has failed to prove his claim that his guilty plea was involuntary.  The Court finds that Defendant's mid-trial decision to change his plea resulted from his realization of the strength of the government's case and the likelihood that he would be convicted and receive a harsh sentence.  The government's evidence included cooperating witnesses, audio and video recordings of hand-to-hand drug transactions by Defendant, surveillance, and physical evidence, as well as the recorded telephone conversations.  The evidence does not suggest that Defendant's realization was caused by any coercion or threat by Mr. Wells or any deficiency in his trial preparation.  The Court finds no reasonable probability that Defendant would not have pleaded guilty but would have insisted on going to trial but for an error on Mr. Wells' part.

The Court also finds insufficient evidence from Defendant's earlier attempt to withdraw his guilty plea and from his testimony at the § 2255 hearing to show that Defendant's guilty plea was not freely and voluntarily made.  Defendant's testimony during the change of plea hearing concerning his understanding, his guilt, and his desire to plead guilty was clear and unequivocal. Defendant did not mention any dissatisfaction with his counsel at that time.  At the § 2255 hearing, Defendant and Mr. Wells testified consistently with each other that Defendant entered into plea discussions after he heard the testimony of Agent Farabow.  Mr. Wells testified concerning his advice in connection with the plea agreement that it was Defendant's best alternative at that time for avoiding a mandatory life sentence and receiving a possible benefit by accepting responsibility for his conduct and cooperating with the government.  This advice was sound and ultimately resulted in Defendant's receipt of a below-guidelines prison sentence.  To the extent there were conflicts in

the hearing testimony, based on the Court's observation of the witnesses, their manner of testifying, and the substance of their testimony, the Court assesses the credibility of the testimony in favor of Mr. Wells on the issue of the voluntariness of Defendant's decision to plead guilty.

Therefore, the Court finds no merit in Defendant's claim of ineffective assistance of counsel and an involuntary guilty plea.

<u>CONCLUSION</u>

Therefore, Defendant's Motion Under 28 U. S. C. §2255 to Vacate, Set Aside, or Correct Sentence [Doc. No. 316] is DENIED.

IT IS SO ORDERED this 5th day of November, 2008.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE